## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| SKY STOODT, | CASE NO. 3:20-cv-02370 |
| Plaintiff, | DISTRICT JUDGE JEFFREY J. HELMICK |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

Plaintiff Sky Stoodt ("Plaintiff" or "Mr. Stoodt") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge pursuant to Local Rule 72.2.  For the reasons set forth below, the undersigned recommends that the Court **VACATE and REMAND** the Commissioner's decision for further proceedings.

On remand, the ALJ should ensure that she provides sufficient explanation to build a logical bridge between her findings regarding the medical opinions and the specific limitations she adopts in the residual functional capacity.

### I.  Procedural History

On April 16, 2018, Mr. Stoodt filed applications for DIB and SSI.  (Tr. 15, 89, 119, 218, 220.)  Mr. Stoodt alleged an onset date of June 30, 2017 (Tr. 15, 218, 220, 238), and asserted he was disabled due to depression, anxiety, and functional capacity seriously limited in self

direction and interpersonal skills (Tr. 66, 92, 121, 129, 242).  His application was denied at the

initial level (Tr. 121-126) and upon reconsideration (Tr. 129-133).  He then requested a hearing.

(Tr. 134-135.)  On December 12, 2019, a hearing was held before an Administrative Law Judge

("ALJ").  (Tr. 33-64.)

On December 26, 2019, the ALJ issued an unfavorable decision, finding Mr. Stoodt had

not been under a disability within the meaning of the Social Security Act from June 30, 2017

through the date of the decision.  (Tr. 12-32.)  Mr. Stoodt requested review of the decision by the

Appeals Council. (Tr. 215-217.)  On August 17, 2020, the Appeals Council denied Mr. Stoodt's

request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)

## II. Evidence

### A.    Personal, Educational, and Vocational Evidence

Mr. Stoodt was born in 1992 and lives with his mother.  (Tr. 26, 38-39.)  He completed

school through the eleventh grade and later received his GED.  (Tr. 40, 243.)   He worked as a

freelance editor for a company's online business from 2015 through early-2017.  (Tr. 42.)  He

then worked at Goodwill, but the job only lasted for a little over a week.  (Tr. 41.)  He quit

because he was having problems dealing with people on the floor and in the warehouse.  (*Id.*)

He then tried working at a county agency, but only worked part-time for about eight weeks, until

June 2017.  (Tr. 41-43, 242.)   The ALJ determined that there was no past relevant work because

the past work did not rise to the level of substantial gainful activity (Tr. 42.)

### B.    Medical Evidence

#### 1.    Treatment History

On March 20, 2014, Mr. Stoodt presented to the emergency room complaining of a panic

attack and reporting shortness of breath, sweating, and numbness in his hands.  (Tr. 418.)  He

reported he had been very stressed over financial matters and had increased anxiety.  (*Id.*)  He reported having ongoing anxiety and depression for several years, but said he had not sought counseling or treatment.  (*Id.*)  He reported using over-the-counter medications to help him sleep. (*Id.*)  He denied suicidal or homicidal ideation.  (*Id.*)  He was discharged with a referral for outpatient follow up for anxiety and panic disorder.  (Tr. 420.)

On August 22, 2016, Mr. Stoodt presented to Lima Memorial to establish care regarding anxiety, obsessive compulsive disorder, and possible thyroid issues.  (Tr. 453, 637.)  He saw Judy Brenek, CNP, and reported that he did not complete high school due to extreme anxiety that led him to become very stressed and compulsive.  (Tr. 453.)  He explained there were times when he would check and recheck things, lose focus, and lose days of his life worrying about one thing.  (*Id.*)  He reported being on Prozac as a teenager, but was not then on any medications. (*Id.*)  On examination, he was alert and in no acute distress.  (*Id.*)  He was diagnosed with anxiety, depression, obsessive compulsive disorder, and fatigue.  (Tr. 454.)  Lab work was ordered and he was started on Celexa for anxiety.  (*Id.*)

On September 20, 2016, Mr. Stoodt saw CNP Brenek for follow up.  (Tr. 643.)  He reported that he had no focus or motivation, his sleep was poor to fair, and he was angry at times, but he was less anxious.  (*Id.*)  He reported that he did not feel that Celexa made a difference, but he denied feeling poorly like the other day.  (*Id.*)  On examination, he was distressed, depressed, anxious, agitated, and had a flat affect, but his eye contact was good and he was smiling and talkative.  (*Id.*)  CNP Brenek recommended that he continue with Celexa, attend counseling, and obtain genetic testing.  (*Id.*)

Mr. Stoodt saw CNP Brenek on October 11, 2016 for medication follow up.  (Tr. 456, 645.)  He reported feeling a little better and being less moody, but relayed that he had been down

at times because two family members had passed away.  (Tr. 456.)  He reported he was doing

well since adding Effexor.  (*Id.*)  On examination, he was alert and oriented and in no acute

distress, and was noted to be doing well on his anxiety medication.  (*Id.*)  He was assessed with

anxiety, and CNP Brenek discontinued Celexa and refilled his Effexor.  (Tr. 456-457.)

 Mr. Stoodt saw CNP Brenek on January 31, 2017 for his depression and anxiety.  (Tr.

647.)  He reported that he was not depressed every day, but had recently broken up with his

girlfriend and was not very motivated at times.  (*Id.*)  CNP Brenek noted that he seemed to be in

a better mood and was smiling a lot.  (*Id.*)  He reported that he was doing better, but did not feel

he was doing as good as he thought he should be.  (*Id.*)  On examination, he was alert and

oriented, he had good eye contact and a normal affect, but he was anxious and depressed.  (*Id.*)

He was assessed with anxiety and his Effexor was increased.  (Tr. 648.)

 When Mr. Stoodt saw CNP Brenek on February 21, 2017, he reported that he was feeling

better and the medication was working.  (Tr. 649.)  He relayed that he lost his job, but was taking

it well.  (*Id.*)  On examination, he had good eye contact and was smiling, less depressed, and

doing well.  (*Id.*)  He was assessed with depression and his Effexor was refilled.  (Tr. 649-650.)

 On March 21, 2017, Mr. Stoodt reported to CNP Brenek that he was feeling pretty good

and needed refills.  (Tr. 651.)  He was smiling and reported he was less depressed and had a job.

(*Id.*)  On examination, he was alert and oriented with good eye contact, he denied suicidal

thoughts, and he was very upbeat.  (*Id.*)  His medications were continued.  (Tr. 651-652.)

 When Mr. Stoodt saw CNP Brenek on June 27, 2017, he presented in a good mood. (Tr.

653.)  He reported that he had some bouts of depression, but they were not as frequent and he felt

his medication was working.  (*Id.*)  On examination, he was alert and oriented, his affect and eye

contact were good, and he was depressed and anxious, but improved.  (*Id.*)  He was assessed with depression and his medication was refilled.  (Tr. 653-654.)

On September 5, 2017, Mr. Stoodt saw CNP Brenek for follow up regarding his depression medication and reported that he was doing fine, his moods were under control, and he had no medication side effects.  (Tr. 655.)  On examination, he was alert and oriented and in no acute distress.  (*Id.*)  He was diagnosed with recurrent major depressive disorder in full remission, and his medication was continued. (*Id.*)

When Mr. Stoodt saw CNP Brenek on October 17, 2017, he reported that he was depressed because he did not have job.  (Tr. 657.)  He also reported having elevated blood pressure and being dizzy at times.  (*Id.*)  On examination, he was doing better, but not in full remission.  (*Id.*)  He was diagnosed with a severe episode of recurrent major depressive disorder, without psychotic features, and his Effexor dose was adjusted.  (Tr. 657-658.)

On November 7, 2017, Mr. Stoodt saw CNP Brenek for a two-week follow-up visit and reported that his depression was about the same.  (Tr. 659.)  He also reported having an increased appetite as a medication side effect, which he did not like.  (Tr. 659.)  On examination, he was alert and oriented and in no acute distress.  (*Id.*)  His diagnosis remained the same, his Effexor dose was adjusted, and Wellbutrin was added.  (Tr. 659-660.)

On November 28, 2017, Mr. Stoodt saw CNP Brenek and reported having a day of rage, being irritable, and having a bad Thanksgiving.  (Tr. 635.)  On examination, he had good eye contact, but he was distressed, depressed, anxious, agitated, and had a flat affect.  (*Id.*)  His diagnosis remained the same and his medication was continued, but CNP Brenek and Mr. Stoodt discussed slowly tapering off Effexor.  (Tr. 635-636.)

When Mr. Stoodt saw CNP Brenek on January 30, 2018, he reported that his depression medications were not working, and he was getting angry at times.  (Tr. 447, 661.)  He also relayed that he had a stiff neck and vertigo.  (*Id.*)  On examination, he was alert, oriented, and in no acute distress.  (*Id.*)  He was diagnosed with episode of recurrent major depressive disorder and instructed to continue taking his Effexor daily.  (Tr. 448, 662.)

Six months later, on July 10, 2018, Mr. Stoodt returned to CNP Brenek with continued complaints of anxiety and depression.  (Tr. 663.)  He reported he was doing better than when he had previously stopped taking his medication, but he was still anxious and depressed.  (*Id.*)  He reported that he had an anxiety attack and blew up a few weeks earlier, did not feel like doing anything, rarely left his home, and had given up on looking for a job.  (*Id.*)  He reported suicidal thoughts but no plan because his mother needed him.  (*Id.*)  On examination, he was alert and oriented and had good eye contact, but he was depressed, anxious, and agitated with a flat affect. (*Id.*)  His diagnosis remained the same.  (Tr. 663-664.)  He was provided a sample of Trintellix and instructed to decrease Effexor and Wellbutrin over the next three days and then stop both. (Tr. 664.)  CNP Brenek also recommended counseling.  (*Id.*)

Mr. Stoodt returned to see CNP Brenek for a one-week follow-up visit on July 18, 2018. (Tr. 665.)  His mother attended the visit with him.  (*Id.*)  He relayed that he had stopped taking Trintellix because he had an explosive episode that resulted in an emergency room visit.  (*Id.*) He reported that he started taking Effexor and Wellbutrin on his own.  (*Id.*)  He denied suicidal thoughts.  (*Id.*)  On examination, he was alert, oriented, and had good eye contact, but he was depressed, anxious, and agitated with a flat affect.  (*Id.*)  He was assessed with anxiety and an episode of recurrent major depressive disorder.  (*Id.*)  CNP Brenek instructed Mr. Stoodt to stop Trintellix and refilled his Effexor.  (Tr. 666.)  CNP Brenek noted that he had previously declined

counseling, but he was planning to go with his mother that day to Coleman Behavior to schedule a counseling appointment. (*Id.*)

On August 28, 2018, Mr. Stoodt saw CNP Brenek for a well visit. (Tr. 667.) He complained of a lump on his neck, exhaustion, excessive sweating, and weight gain. (*Id.*) He was requesting medication refills. (*Id.*) On examination, he was alert, oriented, and in no acute distress. (*Id.*) He was assessed with anxiety and his Effexor was refilled. (Tr. 668.)

On April 16, 2019, Mr. Stoodt saw CNP Brenek and complained of night terrors and suicidal thoughts, and requested medication refills. (Tr. 670.) He reported that he was tired all day even after sleeping through the night. (*Id.*) On examination, he was depressed and distressed, but he had good eye contact and normal affect. (*Id.*) He was assessed with anxiety, major depressive disorder, and daytime somnolence. (Tr. 671.) CNP Brenek adjusted his Effexor and referred him for an evaluation regarding his daytime sleepiness. (*Id.*)

On September 24, 2019, Mr. Stoodt saw CNP Brenek for a wellness visit. (Tr. 748.) On examination, he had good eye contact, but he was distressed, depressed, and anxious with a flat affect. (Tr. 749.) He reported that he was living with his mother and she had lost most of her income because her work was cut back. (*Id.*) He reported feeling hopeless. (*Id.*) CNP Brenek noted that his affect brightened when she provided him with ideas of places where he and his mother might be able to get assistance. (*Id.*) He was assessed with anxiety and depression. (*Id.*) On the same date, CNP Brenek authored a "To Whom It May Concern" letter stating Mr. Stoodt was being treated at Lima Family Care and their care plan had "him unavailable to work until at least 12/24/2019." (Tr. 711.)

On that same date, Mr. Stoodt presented to SAFY of Ohio for a diagnostic assessment completed by Therapist Ravonn Kaufmann, MSW, LSW and co-signed by Treatment Director

Judith Lester, LISW-S.  (Tr. 714-736.)  He reported that until leaving the house for his appointments that day, he had not been out of his house for at least thirty days. (Tr. 731.)  He presented as cooperative, but was agitated, talked excessively, had tangential speech, an anxious and depressed mood, a blunted affect, impaired insight/judgment, and preoccupied thought processes, and expressed suspicion of others.  (Tr. 725, 731.)  He reported that his anxiety and depression increased after he learned that he would have to attend a group class to continue receiving food and other assistance.  (Tr. 727, 730, 731.)  He was seeking a letter explaining that it was not reasonable for him to attend a group class due to psychological limitations.  (Tr. 714, 731.)  He reported an extensive history of being bullied while in school.  (Tr. 718, 731.)  He also reported having feelings of guilt/worthlessness and tending to withdraw socially since middle school.  (Tr. 727.)  He reported suicidal ideation almost daily since middle school, but no intent to act and no prior suicidal attempts.  (Tr. 726, 731.)  He reported having a strong relationship with his mother and a therapy cat to help with stress.  (Tr. 724.)  He was assessed with adjustment disorder with mixed anxiety and depressed mood, and counseling was recommended. (Tr. 731, 734, 736.)

On October 1, 2019, Mr. Stoodt met with Carley Springer, LPC, at SAFY to establish a plan of care.  (Tr. 731, 738.)  He was dressed appropriately, appeared appropriate, was cooperative, spoke with a normal tone and fluency, had a euthymic mood with a full range affect, and had appropriate insight, logical thought process, and no impairment in intellectual functioning.  (Tr. 738.)  Mr. Stoodt's plan of care included working on increasing his self-esteem because he relayed negative thoughts about himself during the session.  (*Id.*)

Mr. Stoodt saw LPC Springer on October 14, 2019.  (Tr. 740.)  He presented in the same manner as his prior visit.  (*Id.*)  He reported taking two long walks and relayed that it was the

"'most peaceful' time he has had." (*Id*.)  He also reported communicating with an old friend. (*Id.*)  His homework included being more authentic, creating four positive affirmations, and being physically active for thirty minutes, three times per week.  (*Id.*)

When Mr. Stoodt saw LPC Springer on November 5, 2019, he reported having a "'near death experience' due to a 'gas leak' in the house."  (Tr. 742.)  He reported that since the incident he was losing his mind, suffering, angry and violent, and experiencing vertigo.  (*Id.*)  He reported that he "went th[r]ough an 'existential crisis' in realizing that he wants to do more to live." (*Id.*)  He was dressed appropriately, appeared appropriate, was cooperative, spoke with a normal tone and fluency, had a euthymic mood with a full range affect, and had appropriate insight, logical thought process, and no impairment in intellectual functioning.  (*Id.*)  He reported that his mother had to sell her life insurance to make ends meet and his food assistance was set to end on November 18th.  (*Id.*)  He requested a letter of recommendation to help him obtain food assistance.  (*Id.*)  His homework was to work on taking care of his basic needs.  (*Id.*)  He denied suicidal or homicidal ideation or plan.  (*Id.*)

Mr. Stoodt saw LPC Springer again on November 14, 2019.  (Tr. 744.)  He was dressed appropriately, had good hygiene, was cooperative, spoke with a normal tone and fluency, had a euthymic mood with a full range affect, and had appropriate insight, logical thought process, and no impairment in intellectual functioning.  (*Id.*)  He reported walking two or three days for about thirty minutes, and was doing two affirmations each morning.  (*Id.*)  He reported that he would be happy if he had a girlfriend and money to help his mom and him get on their feet.  (*Id.*)  He stated that if he had a year of disability, it would help him provide for his mom, get a house and car, get a job, and his anxiety and depression would disappear.  (*Id.*)  He agreed to continue working on his coping skills and positive affirmations.  (*Id.*)

On December 3, 2019, Mr. Stoodt saw CNP Brenek.  (Tr. 746.)  He reported he was unable to work due to his anxiety and depression, that he could not work around more than one person, and that thinking about going to work caused increased anxiety.  (*Id.*)  He stated that he was very uncomfortable being around people he did not know, and counseling was not helping. (*Id.*)  On examination, he was depressed.  (*Id.*)  CNP Brenek also observed that he was alert and oriented and had a normal affect and good eye contact with her, noting that his heart rate was raised during the visit even though he was a long-time patient.  (*Id.*)  He was diagnosed with major depressive disorder with current active episode and panic attacks.  (Tr. 747.)  CNP Brenek recommended that he slowly decrease Effexor and start Zoloft.  (*Id.*)

2.    **Opinion Evidence**

a.    **Psychological Consultative Examiner**

On June 5, 2018, Mr. Stoodt saw Michael Wuebker, Ph.D., for a consultative psychological evaluation.  (Tr. 488-495.)  He reported that he was seeking disability due to depression and anxiety, and mentioned problems with his right arm.  (Tr. 488.)  He reported dealing with depression for most of his life, but not participating in mental health counseling since eighth grade.  (Tr. 490.)  He stated he was never hospitalized for psychiatric reasons.  (*Id.*) He reported taking psychotropic medication for a year and a half.  (*Id.*)  He stated he noticed some improvement with medication, but he felt he was getting used to the medication and it was not as effective as it had been.  (*Id.*)  He described limited activities of daily living and limited interaction with anyone other than his mother.  (Tr. 492.)

On examination, Mr. Stoodt was clean, neat, and cooperative, and maintained adequate eye contact.  (Tr. 490.)  He had to be redirected several times and, when asked, confirmed that he was getting more anxious as the interview proceeded.  (*Id.*)  His speech was clear and

understandable, his tone and pace were within normal limits, and his thought content was logical and coherent.  (Tr. 491.)  He reported feeling depressed all the time.  (*Id.*)  His mood appeared somewhat depressed and his affect was restricted.  (*Id.*)  When describing his depression, he stated "I feel like I'm an infinite loser."  (*Id.*)  He reported having problems falling asleep and staying asleep. (*Id.*)  He reported periods of anxiety, saying he felt like he was having a heart attack, had headaches, and felt nauseous.  (*Id.*)  He reported having daily anxiety episodes that started when he was in grade school.  (*Id.*)  He stated that he feared social situations, even those involving family, and was afraid of being embarrassed or belittled.  (*Id.*)  He reported being in one relationship with a girlfriend that lasted four months.  (*Id.*)  He said he avoided most appointments because of his anxiety, and he was not able to sleep the night before his appointment with Dr. Wuebker because he was worrying about it.  (*Id.*)  He denied hallucinations but exhibited some paranoia in that he thought other people were judging him and thinking the worst about him.  (*Id.*)  There was no clinical evidence of thought disorder.  (*Id.*)  He was oriented to person, place, time, and situation.  (*Id.*)  His recent and remote memory were adequate, and he appeared to function within the average range of cognition.  (Tr. 491-492.)  He exhibited adequate insight and ability to make common sense judgments and was aware of his mood and anxiety issues.  (Tr. 492.)

Dr. Wuebker diagnosed him with major depressive disorder, recurrent, severe, and social anxiety disorder.  (Tr. 493.)  He then provided his opinions regarding Mr. Stoodt's functional abilities, finding first that Mr. Stoodt "would be expected to understand and apply instructions appropriately for one step and a few complex workplace instructions."  (Tr. 493.)  With respect to his abilities to maintain attention, concentration, persistence, and pace, Dr. Wuebker opined that "[i]t would appear likely that the claimant's mental health issues would negatively affect his

ability to perform these abilities appropriately in a work situation," noting that that Mr. Stoodt reported some difficulties with these abilities at work and demonstrated some problems in this area during the evaluation.  (*Id.*)

With respect to Mr. Stoodt's abilities to respond appropriately to supervision and coworkers in a work setting, Dr. Wuebker opined that "[i]t would seem likely that the claimant would have difficulty with these skills in a work" setting, noting that he interacted well during the assessment, but appeared to become more anxious as the interviewed proceeded.  (Tr. 493.) Dr. Wuebker also noted that Mr. Stoodt reported having arguments with bosses regarding being more social with other people.  (*Id.*)  With respect to his abilities to respond appropriately to work pressures in a work setting, Dr. Wuebker opined that "[d]ue to mental health issues, the claimant would likely have difficulty responding appropriately to work stressors," remarking that Mr. Stoodt had reported quitting jobs without having another job arranged.  (*Id.*)  With respect to Mr. Stoodt's ability to manage funds, Dr. Wuebker stated "claimant gave no indication that he would be unable to manage any funds awarded."  (Tr. 494.)

**b.     State Agency Reviewing Psychological Consultants**

On initial review, on June 12, 2018, state agency reviewing psychological consultant Kristen Haskins, Psy. D. completed a Psychiatric Review Technique ("PRT") (Tr. 70-71) and Mental Residual Functional Capacity Assessment ("MRFC") (Tr. 72-74).  In the PRT, Dr. Haskins found that Mr. Stoodt had:

- mild limitations in his ability to understand, remember, or apply information;

- moderate limitations in his ability to interact with others;

- moderate limitations in his ability to concentrate, persist, or maintain pace; and

- moderate limitations in his ability to adapt or manage oneself.

12

(Tr. 70.)   In the MRFC, Dr. Haskins opined that Mr. Stoodt:

- was not significantly limited in the area of understanding and memory;

- could complete short cycle tasks in a setting without fast pace demand;

- should avoid large group interaction (ten or more people) and should have brief, superficial interaction with others; and

- could work within a set routine where major changes are explained in advance and gradually implemented to allow time for adjustment to new expectations and could adequately handle tasks without strict time limitations or production standards.

(Tr. 72-74.)

At the reconsideration level, on October 7, 2018, state agency reviewing medical consultant Jaime Lai, Psy.D. completed a PRT (Tr. 97-98) and an MRFC (Tr. 99-101), reaching findings like those of Dr. Haskins.  Dr. Lai explained that moderate limitations in maintaining concentration and pace, social interaction, and adaptation were consistent with the consultative examiner's findings and the primary care physician's notes. (Tr. 101.)   Dr. Lai also explained that there were only minor edits to the wording of the MRFC for the purpose of better clarity. (*Id.*)  Dr. Lai's MRFC findings were that Mr. Stoodt:

- had no more than mild limitations in the area of understanding and memory;

- could carry out one to three short cycle tasks without strict production or pace requirements;

- could have brief, superficial interaction with others, but should not be required to interact with large groups (ten or more people); and

- could work within a set routine where major changes are explained in advance and gradually implemented to allow time for adjustment to new expectations and could adequately handle tasks without strict time limitations or production standards.

(Tr. 99-101.)

## C.    Hearing Testimony

### 1.    Plaintiff's Testimony

At the December 12, 2019 hearing, Mr. Stoodt testified in response to questioning by the ALJ and his counsel.  (Tr. 38-57.)   Mr. Stoodt indicated that he had his driver's license but had not driven for about one or two years.  (Tr. 40.)  His mom drove him to the hearing.  (*Id.*)  When asked what he felt limited his ability to work, Mr. Stoodt stated

> I don't function well around other people.  Usually if there's more than two people in a room I get really anxious . . . Depending on how I'm feeling, sometimes I feel violent when there's too many people, because I feel like I'm trapped and I just need to get out.  And if I don't know where the exit is, that makes it even worse.  I tend to shut down when I get too anxious, to the point where when I get too stressed, sometimes I just want to go to sleep, like I could just sleep sitting up if it gets bad enough.

(Tr. 43.)  He also explained he had never been able to and did not think he would be able to work an eight-hour day, five days a week because "[e]ither [he] would get too focused because of OCD or [he] would end up burning out on anxiety and depression and just failing to finish off the day."  (Tr. 57.)

He stated he frequently slept "seven out of eight hours during the day" because of the stress and anxiety he experienced just thinking about what he might have to do or where he might have to go.  (Tr. 43-44.)  He reported he was unmotivated to do anything and left the house about once every month or two.  (Tr. 44, 55.)   He saw doctors for his anxiety, depression,

14

and obsessive compulsive disorder (OCD).  (Tr. 52.)  Regarding his OCD, he said he needed things to be in a certain place, order, or height, and if they were not, he had to check multiple times to make sure they were how or where they were supposed to be (Tr. 52.)  He explained that his OCD was worse if he was feeling more anxious or depressed.  (Tr. 52-53.)  He also stated that his OCD made it difficult for him to perform jobs that required organizing or sorting, such as when he tried working at Goodwill.  (Tr. 53, 56.)

With respect to treatment for his mental health conditions, Mr. Stoodt reported taking medication since 2017, but could not recall the names of his medications.  (Tr. 44.)  He indicated his medications had been adjusted numerous times, but he did not feel that the medications helped much and had relayed that to his doctors.  (Tr. 44, 48.)  He reported recently switching to Zoloft, but said it caused him to feel ill and his mood swings were more violent.  (*Id.*)  He reported starting counseling at SAFY in October 2019 and attending eight or nine sessions.  (Tr. 44-45, 54.)  The only other counseling he had received was when he was in middle school.  (Tr. 44.)  He reported that the counseling at SAFY had not been too helpful, explaining that he was working with one of their newer counselors and he did not feel that she grasped the severity of his disorder.  (Tr. 45.)  He denied inpatient psychiatric hospitalization, but reported seeking emergency room treatment for panic attacks, with his last emergency room visit being in May 2019.  (Tr. 47.)  He denied suicidal attempts but reported suicidal ideation.  (Tr. 48.)

Mr. Stoodt reported sleeping about four to five hours each night and napping during the day.  (Tr. 48-49.)  He reported being able to take a shower or bath, dress himself, use a cell phone, prepare simple meals for himself, and clean up after himself, but said he had never done laundry and that he was unmotivated to prepare food, take care of himself, or clean up after himself when he was anxious or depressed.  (Tr. 49, 55, 56.)  He reported sometimes wearing

the same clothes for a couple of weeks. (Tr. 55.) He explained that on a typical day he woke up in the morning to see his mom off to work, went back to sleep for a few hours, and then watched television and slept more until his mom returned home from work around 4:00 p.m. (Tr. 49-50.) He reported watching television or videos for four or five hours each day. (Tr. 50.) He indicated he rarely played video games, but he liked to read a variety of materials, including novels and comics. (*Id.*) He testified that the last book he read that he found interesting was *The Count of Monte Cristo*. (*Id.*)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing. (Tr. 58-63.) The ALJ reminded the VE that she was finding no past relevant work and then asked the VE whether there would be jobs that an individual with the claimant's age, education, and work experience could perform if limited as follows:

> The individual can perform at all exertional levels with the following limitations. The individual can perform simple routine and repetitive one to three-step task[s] but not a production-rate pace. So for example, no assembly-line work. The individual can respond appropriately to occasional interaction with supervisors, coworkers and the general public, but with no team or tandem work with coworkers. The individual can tolerate few changes in the work environment defined as job duties that remain static and are performed in a stable, predictable work setting. Any changes need to occur infrequently and be adequately and easily explained.

(Tr. 59.) The VE testified that the described individual could perform the following jobs: (1) laborer for stores, a medium exertional level, SVP 3 job; (2) retail marker, a light exertional level, SVP 2 job; and (3) light cleaner or housekeeper, a light exertional level, SVP 2 job.[1] (Tr. 60.) The VE also testified that it was generally acceptable for an employee to be off task up to

---

[1] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 WL 1898704, *3 (Dec. 4, 2000). "Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT." *Id.*

ten percent of the day, but that it would become work preclusive if the employee was off task above that amount.  (Tr. 60-61.)  As far as absences, the VE indicated that employers would generally tolerate one attendance incident per month.  (Tr. 61.)

In response to questioning from Mr. Stoodt's counsel, the VE confirmed that for purposes of the ALJ's hypothetical she assumed that the individual's ability to complete a normal day and work week remained intact.  (Tr. 62.)  The VE also testified that she assumed the hypothetical individual could interact in a socially acceptable manner even though limited to occasional interaction.  (Tr. 62-63.)  The VE agreed that there would be no work available if the described individual: (1) responded inappropriately towards coworkers, employers, or supervisors, even on an occasional basis, by becoming violent or walking away mid-discussion; (2) was limited to no more than one-step tasks and could not deal with even the stress associated with simple, routine, repetitive tasks on a consistent eight-hour a day, five-day basis; or (3) could not maintain attention, concentration, or persistence to complete even simple, repetitive tasks with no production rate and all of the other limitations described in the ALJ's hypothetical.  (*Id.*)

### III. Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520, 20 C.F.R. § 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her December 26, 2019, decision, the ALJ made the following findings:[3]

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2021.  (Tr. 17.)

2.    The claimant has not engaged in substantial gainful activity since June 30, 2017, the alleged onset date. (*Id.*)

3.    The claimant has the following severe impairments: major depressive disorder; social anxiety disorder; and panic disorder.  (Tr. 17-18.)

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  (Tr. 18-21.)

5.    The claimant has the RFC to perform a full range of work at all exertional levels but with the following non-exertional limitations: he can perform simple, routine, and repetitive one-to-three step tasks, but not at a production rate pace so, for example, no assembly line work; he can respond appropriately to occasional interaction with supervisors, coworkers, and the general public, but no team or tandem work with coworkers; he can tolerate few changes in the work environment, defined as routine job duties that remain static and are performed in a stable, predictable work setting; and any changes need to occur infrequently and be adequately and easily explained.  (Tr. 21-26.)

6.    The claimant has no past relevant work. (Tr. 26.)

7.    The claimant was born in 1992 and was 24 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  (*Id.*)

8.    The claimant has at least a high school education and is able to communicate in English.  (*Id.*)

9.    Transferability of job skills is not material to the determination of disability.  (*Id.*)

10.   Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the

---

[3] The ALJ's findings are summarized.

claimant can perform, including laborer of stores, retail marker, and cleaner housekeeper. (Tr. 26-27.)

Based on the foregoing, the ALJ determined that Mr. Stoodt had not been under a disability, as defined in the Social Security Act, from June 30, 2017, through the date of the decision. (Tr. 27.)

## V. Plaintiff's Arguments

Mr. Stoodt argues that the RFC is not supported by substantial evidence because: (1) the ALJ failed to account for his moderate limitations in maintaining concentration, persistence, and pace; and (2) the ALJ failed to account for the opinions of the state agency reviewing medical consultants and failed to explain why social interaction limitations contained in those opinions were not included in the RFC even though the ALJ found the opinions persuasive. (ECF Doc. 15, pp. 7-14, ECF Doc. 18, pp. 2-5.)

## VI. Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)); *see also Blakely*, 581 F.3d at 406.  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

      "'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakely*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Blakely*, 581 F.3d at 406 ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'")(quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

      Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007), citing *Wilson v. Comm'r of Soc. Sec.* 378 F.3d 541, 546-547 (6th Cir. 2004)).

A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010), *report and recommendation adopted*, 1:09-cv-1982, 2010 WL 2929550 (N.D. Ohio July 27, 2010).

**B.      First Assignment of Error: Whether ALJ Failed to Account for Moderate Limitations in Maintaining Concentration, Persistence, and Pace**

Mr. Stoodt argues that the ALJ failed to account in the RFC for his moderate limitations in maintaining concentration, persistence, and pace, despite findings by the consultative examiner, state agency reviewing psychological consultants, and the ALJ herself that he had moderate limitations in that area.  (ECF Doc. 15, pp. 7-10.)   The Commissioner responds that the ALJ adequately accounted for Mr. Stoodt's limitations in the RFC, and that Mr. Stoodt has not shown additional restrictions were necessary.  (ECF Doc. 17, pp. 14-15.)

It is apparent on even a cursory review of the record that the ALJ adopted an RFC containing restrictions specifically designed to address Mr. Stoodt's limitations in maintaining concentration, persistence, and pace.  In particular, the ALJ limited Mr. Stoodt to the performance of "simple, routine, and repetitive one-to-three step tasks, but not at a production rate pace so, for example, no assembly line work."  (Tr. 21.)  These limitations generally align with the opinion of state agency psychological consultant Kristen Haskins Psy.D. that his moderate limitations in sustained concentration and persistence would be accommodated by a restriction to "short cycle tasks in a setting that does not have fast pace demand" (Tr. 73, 85), and the parallel finding of state agency psychological consultant Jaime Lai Psy.D. that his limitations in sustained concentration and persistence were consistent with the performance of "1-3 step

short cycle tasks without strict production or pace requirements" (Tr. 100, 114). Thus, the ALJ addressed Mr. Stoodt's moderate limitations in concentration, persistence and pace by limiting both the complexity and the pace of the tasks he would be expected to perform.

While the ALJ's language is not identical to that of the psychological consultants, an ALJ "is not required to recite the medical opinion of a physician verbatim in [her] residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 Fed. App'x 149, 157 (6th Cir. 2009). The RFC limitations are analogous to the psychological consultants' limitations, and consistent with restrictions found by other courts to accommodate moderate limitations in concentration, persistence and pace. *See, e.g., Kirkhart v. Comm'r of Soc. Sec.*, No. 1:18-CV-241, 2019 WL 2314860, at *6 (S.D. Ohio May 31, 2019) ("The Court … finds that the ALJ reasonably accounted for the moderate limitations on concentration, persistence and pace assessed by the reviewing psychologists by restricting her to "simple, routine tasks," "simple, work-related decisions," "occasional changes in a routine work setting," and no "production rate pace work."), *report and recommendation adopted*, No. 1:18CV241, 2019 WL 4727373 (S.D. Ohio Sept. 27, 2019); *see also Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 635 (6th Cir. 2016) (noting there is no "rule that a hypothetical providing for simple, unskilled work is *per se* insufficient to convey moderate limitations in concentration, persistence and pace"); *Jackson v. Comm'r of Soc. Sec.*, No. 1:10CV763, 2011 WL 4943966, at *4 (N.D. Ohio Oct. 18, 2011) (holding law does not require restrictions beyond "simple, repetitive tasks" for an individual with moderate difficulties in concentration, persistence, or pace).

In support of his argument that the RFC limitations do not fully account for his moderate limitations in concentration, persistence, and pace, Mr. Stoodt appears to assert that the RFC improperly relied on an assumption that he was able complete the tasks described in the RFC on

"a consistent eight-hour a day, five-day basis."  (Tr. 62; *see* ECF Doc. 15, pp. 7, 9-10 (citing VE testimony at Tr. 62).)  While the VE's testimony does reflect that an ability to perform full-time work was implicit to her findings, Mr. Stoodt fails to provide evidence or authority to support a finding that moderate limitations in concentration, persistence, and pace are *per se* inconsistent with full-time work.  Indeed, given the VE's testimony that an inability to perform full time work on a consistent basis is "work preclusive," it appears that Mr. Stoodt is seeking a finding that moderate limitations in this domain are by their nature work preclusive.  That is not consistent with governing law or the evidence in this case.

Mr. Stoodt also asserts the ALJ must account for the frequency with which a claimant can concentrate, in addition to the sophistication or intensity of the work that can be done, in order to adequately account for problems with concentration.  (ECF Doc. 15, pp. 9-10, *citing Benton v. Comm'r*, 511 F. Supp. 2d 842, 846 (E.D. Mich. 2007) and *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 517 (6th Cir. 2010).)   He argues that the ALJ did not account for the frequency component here because a limitation to simple repetitive tasks does not address how frequently he cannot concentrate. (ECF Doc. 15, pp. 9-10.)  His argument is not well tailored to this case, as he fails to acknowledge that the RFC limitations here also included a limitation to no "production rate pace" including "no assembly line work."  (Tr. 21.)

The Sixth Circuit's findings in *Ealy* do not require a different result, as that court faulted the ALJ for failing to include "speed- and pace-based restrictions" described in the underlying medical opinion.  594 F.3d at 517.  Here, the relevant medical opinions limited Mr. Stoodt to "short cycle tasks in a setting that does not have fast pace demand" (Tr. 73, 85) and "1-3 step short cycle tasks without strict production or pace requirements" (Tr. 100, 114).  The ALJ's limitation to "simple, routine, and repetitive one-to-three step tasks, but not at a production rate

pace so, for example, no assembly line work" (Tr. 21) appropriately echoed and accommodated the speed and pace restrictions set forth in the underlying medical opinions.

In considering Mr. Stoodt's limitations in concentration, the ALJ also considered the totality of the evidence, including Mr. Stoodt's reports that he watched television or videos and played video games for more than four hours each day and read novels, and the opinion evidence.  (Tr. 23, 24-25, 50, 749.)  Having considered the evidence and medical opinions, the ALJ appropriately accounted for Mr. Stoodt's moderate limitations in concentration, persistence, and pace.  Plaintiff has not shown evidence to establish that a more restrictive RFC was required to adequately account for his concentration, persistence, and pace limitations.

Thus, for the reasons set forth above, the undersigned finds no merit to Mr. Stoodt's argument that the RFC failed to account for his moderate limitations in concentration, persistence, and pace.

**C.    Second Assignment of Error: Whether ALJ Failed to Properly Account for State Agency Reviewing Psychological Consultants' Opinions**

Mr. Stoodt next contends that the ALJ erred in her evaluation of the state agency psychological reviewing consultants' opinions because she: (1) failed to even mention the opinion of the second reviewer; and (2) failed to include the recommended social limitations to superficial interaction with no large group interaction in the RFC, despite finding the opinion persuasive and without explaining why the limitations were not included.  (ECF Doc. 15, pp. 10-14, ECF Doc. 18, pp. 2-5.)  The Commissioner responds that the ALJ's failure to specifically consider one of the two state agency reviewing medical consultants' opinion was harmless, and that the ALJ was not required to adopt all limitations contained in opinions found to be persuasive or to explain why such limitations were not adopted.  (ECF Doc. 17, pp. 11-13.)

### 1.     Regulations Governing Analysis of Medical Opinions

Since Mr. Stoodt's claims were filed after March 27, 2017, the Social Security

Administration's ("SSA") new regulations for evaluation of medical opinion evidence apply to

his claim.  *See Revisions to Rules Regarding the Evaluation of Medical Evidence* (*Revisions to*

*Rules*), 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.   The

regulations specify that SSA "will not defer or give any specific evidentiary weight, including

controlling weight, to any medical opinion(s) or prior administrative medical finding(s),

including those from [a claimant's] medical sources."  20 C.F.R. § 404.1520c(a).  Distinct from a

prior framework that gave more weight to opinions from treating sources, the new regulations

provide that "administrative law judges will now evaluate the 'persuasiveness' of medical

opinions by utilizing the five factors listed in paragraphs (c)(1) through (c)(5) of the regulation."

*Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8,

2020) (quoting *Gower v. Saul*, 2020 WL 1151069, at * 4 (W.D. Ky, March 9, 2020) (citing 20

C.F.R. § 404.1520c(a) and (b)); *see also Ryan L. F. v. Comm'r of Soc. Sec.*, No. 6:18-CV-01958-

BR, 2019 WL 6468560, at *4 (D. Or. Dec. 2, 2019) ("Although the regulations eliminate the

'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a

medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions'

and 'how persuasive [he/she] find[s] all of the medical opinions.'") (citing 20 C.F.R. §§

404.1520c(a) and (b) (1), 416.920c(a) and (b) (1)) (alterations in original)).

The five factors to be evaluated are supportability, consistency, relationship with the

claimant, specialization, and other factors, but supportability and consistency are acknowledged

to be the most important factors for consideration.  20 C.F.R. § 404.1520c(c)(1)-(5); 20 C.F.R. §

404.1520c(b)(2).  The new regulations specify that ALJs "may, but are not required to, explain

how [they] considered the factors in paragraphs(c)(3) through (c)(5) of this section, as appropriate, when [they] articulate how [they] consider medical opinions and prior administrative medical findings in [a claimant's] case record."  20 C.F.R. § 404.1520c(b)(2). They "'must consider' medical findings of non-examining state agency medical or psychological consultants according to the new regulation."  *Gower*, 2020 WL 1151069, at *4 (citing 20 C.F.R. § 404.1513a(b)(1)).

### 2.      Whether ALJ's Failure to Evaluate Dr. Lai's Opinion Requires Remand

With respect to the medical opinion of Dr. Haskins, the state psychological reviewing consultant at the initial level, the ALJ held: "The mental assessment of Kristen Haskins, PsyD., the State Agency's psychological consultant at 1A and 2A is persuasive.  consistent with and supported by the evidence." (Tr. 24.)  Mr. Stoodt is correct that the ALJ failed to mention or weigh the later opinion of Dr. Lai, the state psychological consultant at the reconsideration level. (*Id.*)  However, Mr. Stoodt did not contend in his opening brief that the ALJ failed to consider opinions offered by Dr. Lai that differed from those of Dr. Haskins.  Instead, he argued that "the problem here is that the ALJ found the state agency opinions to be persuasive," but then failed to account for the doctors' near-identical findings that he should be limited to "brief, superficial interaction with others" and should not "interact with large groups (10+ people)."  (Tr. 73, 85, 101, 115; *see* ECF Doc. 15 pp. 11-12.)  This argument is addressed in Section VI.C.3 below.

Because Mr. Stoodt's argument in the initial brief focuses on identical opinion testimony from both providers, there appears to be no argument that the ALJ's failure to cite to Dr. Lai was harmful error.  Where arguments are not fully developed, a court may find the arguments waived.  *McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed

waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.") (internal citations omitted) (alterations in original); *Ray v. Saul*, No. 1:19-CV-01880, 2020 WL 5203493, at *10 (N.D. Ohio Sept. 1, 2020) (finding conclusory and undeveloped arguments waived).

Nevertheless, the undersigned has considered the new assertion in Mr. Stoodt's reply brief that the failure to discuss Dr. Lai's opinion was not harmless because Dr. Lai opined that Mr. Stoodt could carry out "1-3 step short cycle tasks . . ." (Tr. 100 (emphasis added)) while Dr. Haskins only opined that he could complete "short cycle tasks . . ." (Tr. 73). In addition to being disfavored as an argument raised for the first time in a reply*, see Lorrison v. Berryhill*, No. 18-CV-10289, 2019 WL 1324247, at *5 (E.D. Mich. Mar. 25, 2019), the argument is futile because, as Mr. Stoodt acknowledges (ECF Doc. 18, p. 3), the ALJ's RFC incorporated the one element of Dr. Lai's opinion that arguably differed from Dr. Haskins' (*see* Tr. 21 (finding Mr. Stoodt can "perform simple, routine, and repetitive one-to-three step tasks . . .)). The undersigned accordingly finds that Mr. Stoodt has failed to demonstrate that specific harm resulted from the ALJ's failure to specifically mention Dr. Lai's opinion in the decision. Nevertheless, because remand is required for further articulation of the evidence as discussed in Section VI.C.3 below, the ALJ should correct this apparent oversight on remand.

### 3. Whether ALJ Appropriately Accounted for State Agency Psychological Opinions Regarding Social Interaction Limitations

The primary question raised in this assignment of error is whether the ALJ adopted social interaction limitations in the RFC that conflicted with the opinion of Dr. Haskins (and by extension Dr. Lai) – which the ALJ found "persuasive" as "consistent with and supported by the evidence" – and then failed to adequately explain her reasoning for adopting different limitations. As noted above, the psychological consultants opined that Mr. Stoodt should not

"interact with large groups[ ](10+ people)" and should be limited to "brief, superficial interaction with others."  (Tr. 101, 115; *see also* Tr. 73, 85.)  In comparison, the ALJ's RFC provided: "He can respond appropriately to occasional interaction with supervisors, co-workers, and the general public, but no team or tandem work with co-workers."  (Tr. 21.)

As a general matter, it is again noted that an ALJ "is not required to recite the medical opinion of a physician verbatim in [her] residual functional capacity finding."  *Poe*, 342 F. App'x at 157.  Indeed, even where an opinion was given great weight under the prior regulations, the Sixth Circuit noted that "there [was] no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor [was] the ALJ required to adopt the state agency psychologist's limitations wholesale."  *Reeves v. Comm'r of Soc. Sec.*, 618 Fed. App'x 267, 275 (6th Cir. 2015); *see also Moore v. Comm'r of Soc. Sec.*, No. 1:13-CV-00395, 2013 WL 6283681, at *7–8 (N.D. Ohio Dec. 4, 2013) (finding ALJ who gave great weight to an opinion was not required to incorporate all limitations from that opinion).

Nevertheless, Social Security Ruling 96-8p requires the ALJ to consider all medical opinions in her RFC assessment and, where her assessment "conflicts with an opinion from a medical source," she "must explain why the opinion was not adopted."  SSR 96–8p, *Assessing Residual Functional Capacity in Initial Claims*, 1996 WL 374184, at *7 (July 2, 1996); *see Fleischer*, 774 F. Supp. 2d at 881 (citing SSR 96-8p).  Since the ALJ did not explain her reasoning for adopting social limitations that were different from those in the state agency opinions, the question becomes whether the social limitations in her RFC "conflicted" with those in the state agency opinions, such that she would be expected to explain her decision not to adopt the limitations under SSR 96-8p.  Mr. Stoodt also argues that there is no logical bridge between the evidence and the RFC because the ALJ failed to include the specific social interaction

limitations set forth in the state agency psychological consultants' opinions despite finding them persuasive, and failed to explain how she accounted for, or why she excluded, those limitations. (ECF Doc. 15, pp. 13-14.)

Before undertaking an analysis of the distinctions between the language in the medical opinions and the RFC in this case, a few observations about VE testimony are in order.  Social Security Ruling 00-4p explains that the Commissioner relies "primarily on the DOT [Dictionary of Occupational Titles] (including its companion publication, the SCO) for information about the requirements of work in the national economy," and uses VEs "to resolve complex vocational issues."  SSR 00-4p, *Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Info. in Disability Decisions*, 2000 WL 1898704, *2 (Dec. 4, 2000); *see also McGeever v. Comm'r of Soc. Sec.*, No. 1:18CV0477, 2019 WL 1428208, at *10 (N.D. Ohio Mar. 29, 2019) ("Although a Social Security Ruling does not have the force of law, it is binding within the Social Security Administration as a statement of policy and interpretation that the S.S.A. has adopted.  Courts generally accord SSRs deference unless plainly erroneous or inconsistent with the regulations.") (citing 20 C.F.R. § 402.35(b)(1); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 550 (6th Cir. 2004).)  Occupational evidence provided by a VE "generally should be consistent with the occupational information supplied by the DOT," although evidence from a VE "can include information not listed in the DOT."  2000 WL 1898704, *2.

It is well understood that "[i]n order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion …, the question must accurately portray a claimant's physical and mental impairments."  *Parks v. Soc. Sec. Admin.*, 413 F. App'x 856, 865 (6th Cir. 2011) (citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010)).  However, it is also understood that a "vocational expert is not

expected to evaluate the claimant's medical conditions," as indeed "any evaluation of medical evidence they perform would be outside their area of expertise." *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (quoting 20 C.F.R. § 416.920(a)(4)(iv)).

Instead, the Commissioner's internal manual requires ALJs to "ask the VE questions designed to elicit clear and complete information" and provides that ALJs should "not permit the VE to respond to questions on medical matters or to draw conclusions not within the VE's area of expertise." HALLEX I-2-6-74(C); *see also Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 399 (6th Cir. 2008) (finding HALLEX is "not binding on this court" but is persuasive authority). Where a VE has based her testimony "on an assumption," the ALJ must "ask the VE to clearly describe the assumption on the record." *Id.* SSR 00-4p further provides that an ALJ may not rely on evidence provided by a VE if the "evidence is based on underlying assumptions or definitions that are inconsistent with [SSA's] regulatory policies or definitions." SSR 00-4p, 2000 WL 1898704, *3.

Thus, a VE's testimony must be based on her own vocational expertise and/or the information in the Dictionary of Occupational Titles ("DOT") and Selected Characteristics of Occupations ("SCO"), and <u>cannot</u> be based on conclusions outside of her expertise, assumptions that are not clearly described on the record, or assumptions or definitions that are inconsistent with the SSA's policies or definitions. For these reasons, it may fall to the ALJ to "convert[] and incorporate[]" the limitations set forth in a medical opinion "into vocationally relevant terms" – i.e., terms that are relevant and meaningful in the DOT / SCO and/or the VE's own vocational experience – before including those limitations in a hypothetical posed to a VE. *See Modro v. Comm'r of Soc. Sec.*, No. 2:18-CV-900, 2019 WL 1986522, at *7 (S.D. Ohio May 6, 2019) (finding ALJ "reasonably converted and incorporated" medical opinions given great weight "into

vocationally relevant terms in Plaintiff's RFC"), *report and recommendation adopted*, No. 2:18-CV-900, 2019 WL 2437296 (S.D. Ohio June 11, 2019).

Here, as noted above, the medical opinions at issue indicated Mr. Stoodt should avoid interacting with "large groups[ ](10+ people)" and should be limited to "brief, superficial interaction with others."  (Tr. 101, 115; *see also* Tr. 73, 85.)  While the opinions appear to have provided a definition for the term "large groups," indicating that this refers to ten or more people, no specific definitions are offered for the terms "brief" or "superficial," and neither term is defined within the DOT or SCO.  The DOT and SCO do have specific defined terms for the frequency of activities or conditions, defining "occasional" activities and conditions as those existing up to 1/3 of the time.  *See Beasley v. Berryhill*, No. 5:16-CV-00108-LLK, 2017 WL 2543814, at *2 (W.D. Ky. June 12, 2017) (explaining that "[t]he terms 'occasional' and 'frequent' are terms of art in Social Security law [and] '[o]ccasional' means occurring from very little up to 1/3 of the time") (citing Social Security Ruling (SSR) 83-10, 1983 WL 31251); DICOT 979.687-034, Appendix C, 1991 WL 688702 (2016); SCODICOT Appendix C & D.  Other defined terms in the DOT and SCO that relate to interactions include mentoring, negotiating, instructing, supervising, diverting, persuading, speaking-signaling, serving, and taking instructions-helping.  SCODICOT Appendix E; *see also Reese v. Saul,* No. 3:18-CV-442-HBG, 2020 WL 1312703, at *14 (E.D. Tenn. Mar. 19, 2020) (explaining that "the 'DOT ranks the degree of interaction with people in each job type' on a scale from 0 (Mentoring) to 8 (Taking Instructions-Helping), going from the highest to the lowest level of functioning") (quoting *Kane v. Saul*, No. 3:18-CV-746 (HEH), 2019 WL 7562760, at *15 (E.D. Va. Aug. 20, 2019), *report and recommendation adopted by*, 2020 WL 130134 (E.D. Va. Jan. 10, 2020).)

While some courts have described the term "superficial interaction" as a "well-recognized, work-related limitation," *Hutton v. Comm'r of Soc. Sec.*, No. 2:20-CV-339, 2020 WL 3866855, at *5 (S.D. Ohio July 9, 2020), *report and recommendation adopted sub nom. Hutton v. Comm'r of Soc. Sec. Admin.*, No. 2:20-CV-339, 2020 WL 4334920 (S.D. Ohio July 28, 2020), the fact remains that the term "superficial interaction" does not have a specific defined meaning under the DOT or SCO. Dictionary definitions of "superficial" do not provide further clarity as to what specific work-related communications are intended to be included or excluded based on this limitation. *See, e.g.,* "Superficial." *Merriam-Webster's Unabridged Dictionary, Merriam-Webster*, https://unabridged.merriam-webster.com/unabridged/superficial. Accessed 11 Jan. 2022 ("not penetrating beneath or farther than the easily or quickly apprehended features of a thing : concerned only with the obvious or apparent"; "lacking in depth or substantial qualities : not profound"; "presenting only an appearance or a semblance : not far-reaching, significant, or genuine"). Thus, for practical purposes, it is not clear from the record what specific manner of communications the psychological consultants intended to permit or exclude in limiting Mr. Stoodt to "brief, superficial interactions." Further, even if the ALJ had posed a hypothetical to the VE limiting Mr. Stoodt to "superficial interactions," is it not clear what specific manner or means of communications the VE would have interpreted this term to permit or exclude.

In this case, the ALJ limited Mr. Stoodt to "occasional interactions" with others. (Tr. 21.) This does not conflict with the psychological consultant's more vague limitation to "brief" interactions, and thus did not require further explanation under SSR 96-8p. The ALJ also limited Mr. Stoodt to "no team or tandem work with co-workers." (Tr. 21.) The question thus becomes whether this additional limitation precluding cooperative work with co-workers is sufficiently consistent with the psychological consultants' limitations to "superficial" and no "large group"

interactions to release the ALJ from the requirement under SSR 96-8p that she explain any conflict between the medical opinions and her RFC.

Courts have found similar limitations to no "team" or "tandem" tasks to be qualitative limitations that appropriately effectuated a medical opinion limiting a plaintiff to "superficial" interactions. *See Hines v. Comm'r of Soc. Sec.,* No. 3:20 CV 620, 2021 WL 1571659, at *3 (N.D. Ohio Apr. 22, 2021) ("[T]the ALJ sufficiently accounted for Hines' 'need for only superficial interaction' in her RFC calculation. Specifically, she limited Hines to jobs involving: '(1) no external source driving productivity; (2) occasional interaction with the public; (3) no tandem work; (4) no responsibility for conflict resolution; and (5) simple, repetitive work with few changes.'"); *Kearns v. Comm'r of Soc. Sec.,* No. 3:19 CV 01243, 2020 WL 2841707, at *12 (N.D. Ohio Feb. 3, 2020) ("[T]he Court agrees with the Commissioner that the ALJ's limitation to no team or tandem tasks is a qualitative limitation on social interaction and adequately addressed the opinion of Drs. Matyi and Finnerty that Kearns be limited to superficial interaction with others."), *report and recommendation adopted*, No. 3:19-CV-1243, 2020 WL 2839654 (N.D. Ohio June 1, 2020) (quoting *Collins v. Comm'r of Soc. Sec.*, No. 3:17 CV 2059, 2018 WL 7079486, at *6 (N.D. Ohio Dec. 7, 2018) ("Contrary to Plaintiff's argument, the ALJ restricted Plaintiff from 'team or tandem tasks' …, which logically require more than superficial interpersonal contact. This is a restriction on the quality of interpersonal contact.") *report and recommendation adopted,* No. 3:17-CV-2059, 2019 WL 1409535 (N.D. Ohio Mar. 28, 2019).).

These cases are not directly on point here, however. In this case, it is not clear that the ALJ's limitations precluding "team or tandem tasks" were intended to address the consultants' limitations to "superficial" interactions, as in the above cases. That is because the psychological consultants also advised that Mr. Stoodt avoid large groups of ten or more people. It could be

argued that a vague limitation to "brief, superficial interactions" is accommodated by a limitation to occasional interactions with no team or tandem tasks, as that combination of limitations would preclude all jobs requiring interaction for more than one-third of the workday and all jobs requiring tasks to be performed in coordination with others.  It could also be argued that a limitation to occasional interactions with no team or tandem tasks would effectively preclude any job with tasks requiring interaction with a group of ten or more people.  The problem here is that it is simply not clear from the record whether the ALJ intended her RFC limitations to effectuate the psychological consultants' limitations, or instead concluded that the record did not fully support the consultants' stated limitations.  Because the reasoning of the ALJ is not apparent from the RFC she adopted, and she did not explain her reasoning in the decision, it cannot be ascertained whether her limitations are consistent with or in conflict with the social interaction limitations suggested by the psychological consultants.

Courts have recognized the complexity of accounting for medical opinions that are stated in vague terms without a specific defined meaning in the vocational context.  *See, e.g., May v. Comm'r of Soc. Sec. Admin.*, No. 3:19-CV-00047, 2020 WL 103579, at *5 (S.D. Ohio Jan. 9, 2020) (finding ALJ "sufficiently accounted for the difference between 'occasional' and 'superficial' contacts" by "explain[ing] that he did not use the term 'superficial' contact because the DOT does not define it" and then "including the more restrictive finding that Plaintiff could not engage with the general public," and finding it was "reasonable for the ALJ to take the combination of these limitations to constitute a 'sufficiently superficial' limitation")*, report and recommendation adopted sub nom. May v. Comm'r of Soc. Sec.,* No. 3:19-CV-47, 2020 WL 1227208 (S.D. Ohio Mar. 13, 2020); *Modro*, 2019 WL 1986522, at *7 (finding ALJ "reasonably converted and incorporated [medical] opinions into vocationally relevant terms" in the RFC,

including a limitation to "occasional superficial contact … with superficial meaning no over-the-shoulder supervision").  But in those cases, the ALJs provided explanations or findings that made their reasoning and intent clear.

As discussed above, a decision will not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.  Here, it cannot be clearly determined whether the interaction limitations adopted by the ALJ were consistent with or in conflict with the interaction limitations described in the state agency psychological consultant opinions.  Because the ALJ also did not offer any explanation for her divergence from the specific findings in those opinions consistent with SSR 96-8p, she failed to build a logical bridge between the evidence and the RFC.

Accordingly, for the reasons set forth in further detail above, the undersigned finds that remand is warranted because the ALJ failed to build an accurate and logical bridge between the evidence and RFC as it relates to Mr. Stoodt's social interaction limitations.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **VACATE and REMAND** the Commissioner's decision for further proceedings.

On remand, the ALJ should ensure that she provides sufficient explanation to build a logical bridge between her findings regarding the medical opinions and the specific limitations she adopts in the residual functional capacity.

January 13, 2022

*/s/ Amanda M. Knapp*
_____
AMANDA M. KNAPP
UNITED STATES MAGISTRATE JUDGE

## **<u>OBJECTIONS</u>**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).